# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

James Garneau

     v.                         Case No. 16-cv-448-SM
                                        Opinion No. 2017 DNH 218
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

## O R D E R

Pursuant to 42 U.S.C. § 405(g), James Garneau moves to reverse the Acting Commissioner's decision to deny his application for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter is remanded to the Acting Commissioner for further proceedings consistent with this order.

## I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

With regard to the statutory requirement that the Acting Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations

omitted).  Moreover, the court "must uphold the [Acting

Commissioner's] conclusion, even if the record arguably could

justify a different conclusion, so long as it is supported by

substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529,

535 (1st Cir. 1988) (per curiam).  Finally, when determining

whether a decision of the Acting Commissioner is supported by

substantial evidence, the court must "review[] the evidence in

the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting

Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material

Facts.  That statement, document no. 11, is part of the court's

record and is summarized here, rather than repeated in full.

Garneau has worked as a psychiatric aide, snowmaker,

rewinder, bakery manager, sales and delivery person, and truck

driver.  On January 10, 2013, he injured his back at work, while

lifting a dryer.  Shortly thereafter, he was given a diagnosis

of back pain with radiculopathy.[1]  His medical records include

additional diagnoses of: degeneration of the lumbar

intervertebral disc; mechanical low back pain with significant

nonphysiologic findings; disc derangement and lumbar strain with

---

[1] Radiculopathy is a "[d]isorder of the spinal nerve roots."
Stedman's Medical Dictionary 1622 (28th ed. 2006).

3

disc protrusion; a cognitive disorder; an adjustment disorder; and a possible learning disability.

Garneau began receiving workers' compensation benefits shortly after his injury.  He applied for DIB in September of 2013.  He claimed that he was disabled as a result of two medical conditions: (1) degenerative disc disease and disc protrusion; and (2) an extra vertebrae in his back.

After Garneau filed his application for DIB, he was referred to Dr. Elizabeth Hess, for a consultative psychological examination.[2]  After she examined Garneau, Dr. Hess prepared a Comprehensive Psychological Profile.  In it, she gave diagnoses of: (1) "[c]ognitive disorder, not otherwise specified secondary to chronic pain with diminished concentration," Administrative Transcript (hereinafter "Tr.") 309; (2) "[a]djustment disorder with mixed anxiety and depression," id.; and (3) "[p]ossible learning disability, not otherwise specified," id.  In addition, Dr. Hess gave the following opinions on Garneau's then-current level of functioning:

> ACTIVITIES OF DAILY LIVING:  This individual needs
> assistance with shopping, cooking, paying bills,
> maintaining his residence, grooming, and hygiene due
> primarily to pain and difficulty with bending or
> sustaining physical activity for any degree of time;

---

[2] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the Social Security Administration's] request."  20 C.F.R. § 404.1519.

however, he also has difficulty with concentrating and needs his girlfriend to help him to remember appointments, make financial decisions, etc.

SOCIAL FUNCTIONING:  This individual interacts appropriately and communicates effectively with others.  He does not see others as much as he used to due to physical limitations.  He does state that he becomes irritable at times due to his pain.

UNDERSTANDING AND REMEMBERING INSTRUCTIONS:  This individual is capable of understanding and remembering basic instructions with the exception of occasional latency due to poor concentration.  He may have some difficulty understanding detailed instructions and will have difficulty in remembering them due to poor concentration and possibly due to cognitive limitations.

CONCENTRATION AND TASK COMPLETION:  This individual can maintain attention and concentration for about one-half hour.  His persistence is limited primarily by physical conditions, and also by limited concentration.  His pace will be very slow.  He will be slow in remembering what he is to do and keeping track of where he is in a task.

REACTION TO STRESS AND ADAPATION TO WORK OR WORK-LIKE SETTINGS:  This individual is capable of making simple decisions.  He is not capable of maintaining regular attendance or schedule due to physical concerns primarily.  He is able to interact appropriately with supervisors and others.  He does become frustrated and irritable when he is not able to do things.

Tr. 308-09.

The record also includes an assessment of Garneau's mental condition by a non-examining consulting psychologist, Dr. Lewis Lester.  After identifying two mental impairments, mood disorders and anxiety disorders, Dr. Lester conducted a psychiatric review technique ("PRT") assessment based upon

5

Garneau's medical records.[3] Dr. Lester determined that Garneau

had no restrictions on his activities of daily living; had mild

difficulties in maintaining social functioning; had mild

difficulties in maintaining concentration, persistence or pace;

and had no repeated episodes of decompensation, each of extended

duration. Then, Dr. Lester gave the following explanation for

his PRT assessment:

> Claimant does not allege any mental impairments,
> [medical evidence of record] does not reflect any
> history of mental health diagnosis, treatment, or
> psychiatric medication. When claimant was sent to a
> [consultative examiner] in an effort to establish a
> "Chronic Pain Syndrome", his self-report of anxiety
> and depression garnered a [consultative examiner]
> diagnosis of Adjustment Disorder with mixed anxiety
> and depression. These self-reported symptoms of
> Anxiety [disorder] and Depressive [disorder] barely
> rise above the level of what are ordinary and expected
> reactions to his physical problems, pain and sequelae;
> [consultative examiner] diagnosis of Cognitive
> [disorder] is not supported by any evidence.
> Associated mental limitations are mild & non-severe by
> [Social Security Administration] standards.

Tr. 87.[4]

The record in this case includes approximately 40 documents

authored by six different medical professionals, each of which

---

[3] The Social Security Administration uses the PRT to
evaluate the severity of mental impairments. See 20 C.F.R. §
404.1520a (describing the PRT).

[4] "Sequelae" is the plural of "sequela," which means "[a]
condition following as a consequence of a disease." Stedman's,
supra note 1, at 1752.

expresses opinions on Garneau's physical residual functional capacity ("RRC").[5]  Those documents include, but are not limited to: (1) a summary of a functional capacity evaluation performed by an occupational therapist at Androscoggin Valley Hospital; (2) a report on an independent medical examination performed by Dr. Daniel O'Neill, for Sedgwick Claims Management Services, Inc.;[6] (3) a Lumbar Spine Medical Source Statement ("Spine Statement") completed by Garneau's primary care provider, Nurse Amanda Dustin; and (4) a Spine Statement completed by a treating orthopedist, Dr. Thomas Rock.

Dr. Rock saw Garneau four times and examined him three times.  In May of 2015, after Garneau's most recent visit with him, Dr. Rock completed a Spine Statement in which he identified diagnoses of degenerative disc disease and multilevel lumbar disc protrusion.  He also described the clinical findings supporting those diagnoses, Garneau's symptoms, and ten positive objective signs of Garneau's condition.  With respect to functional limitations, Dr. Rock opined that Garneau: (1) could sit for five minutes at a time before needing to get up; (2)

_____

[5] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

[6] Sedgwick was managing Garneau's workers' compensation claim.

7

could not stand; (3) could sit and stand/walk for a total of less than two hours in an eight-hour workday; (4) needed a job that permits shifting positions at will from sitting, standing, or walking; (5) needed to walk around during an eight-hour workday; (6) needed to take unscheduled breaks; (7) could lift less than 10 pounds, but only rarely; (8) could rarely twist; (9) was likely to be "off task" for 20 percent of a workday; (10) was incapable of even "low stress" work; and (11) was likely to be absent from work more than four days per month as a result of his impairment or treatment for it.

Dr. Rock did not examine Garneau in connection with preparing his Spine Statement, but in an office note he wrote approximately six months earlier, Dr. Rock documented his musculoskeletal examination of Garneau:

> On examination he is alert and oriented and in no distress. He has stiffness with flexion and extension and rotation of the lumbar spine. There is bilateral lumbar paravertebral muscle spasm with tenderness. He does have stiffness in his walking and lower extremity neurologic is intact but he does have radiation of pain and some numbness and tingling in the lower left leg. Straight leg raising is positive on the left. He has maintained strength in the lower leg with ability to dorsiflex and plantarflex the left foot. He has good circulation and sensation without lymphedema.

Tr. 420.[7]  In a New Hampshire Workers' Compensation Medical Form

("Comp Form") that Dr. Rock filled out on the same day he wrote

the office note quoted above, he stated that Garneau had no work

capacity and had reached maximum medical improvement.  He

restated those opinions in a Comp Form he filled out on the same

day he completed his Spine Statement in May of 2015.

After Garneau's claim was denied at the initial level, he

received a hearing before an Administrative Law Judge ("ALJ").

At the hearing, the ALJ took testimony from a vocational expert

("VE"), to whom she posed a series of hypothetical questions.

The ALJ framed her second hypothetical this way:

> I want you to assume . . . a younger individual with a
> 12th grade education, and past work as described.  For
> the purposes of this hypothetical, I want you to
> assume that the individual can perform sedentary work
> as defined by the [Dictionary of Occupational Titles].
> But after one hour of sitting the individual would
> need to stand without leaving the work station and
> stretch for two to three minutes.  I want you to
> assume that the individual would have to avoid
> climbing ladders, ropes, and scaffolds and crouching
> would be limited to a rare basis, which I am defining
> as less than or equal to 10 percent of the work day.
> I want you to assume that other postural activities
> could be performed on an occasional basis.  I want you
> to assume that reaching would be limited to frequently

---

[7] "Dorsiflexion" is the "[u]pward movement (extension) of
the foot or toes or of the hand or fingers." Dorland's, supra
note 1, at 580.  "Plantarflexion" is "bending the foot or toes
toward the plantar surface." Id. at 753.  "Lymphedema" is
"[s]welling (especially in subcutaneous tissues) as a result of
obstruction of lymphatic vessels or lymph nodes and the
accumulation of large amounts of lymph in the affected region."
Id. at 1127.

as opposed to constantly. In addition, I want you to
assume that lifting objects from the floor would be
limited to a rare basis again, defined as less than or
equal to 10 percent of the work day. In addition, the
individual would have to avoid working on slippery wet
or elevated flooring and would also have to avoid
erratically moving surfaces.

Tr. 71-72. According to the VE, a person with the foregoing RFC

could perform the jobs of surveillance systems monitor,

telephone solicitor, and fishing reel assembler. The VE

testified that those same jobs would be available if the

hypothetical was amended to include these limitations:

[T]he individual would be limited to uncomplicated
tasks, which I have defined as tasks that typically
can be learned in 30 days or less. And due to
symptoms, concentration, persistence, and pace would
be diminished. But productivity would not be more
than 10 percent below the norm.

Tr. 73-74. The VE further testified that the same jobs could be

performed by the person in the ALJ's hypothetical if that person

also needed to stand and stretch every 30 minutes and was

limited to occasional overhead lifting. However, the VE

testified that no jobs would be available to the person in the

ALJ's hypothetical if he were to be absent from work at least

three days a month,[8] or if his "concentration, persistence, and

pace was diminished to the point where productivity was 15 to 20

percent below the normal," Tr. 74.

---

[8] According to the VE, the customary tolerance for absence
from work is "[n]o more than two days a month." Tr. 74

In response to questioning by claimant's attorney, the VE testified that the sedentary jobs he identified could be performed by a person who "was limited to a maximum lift of 10 pounds and could only lift 12 inches off the ground to shoulder level only, would need frequent postural changes every 15 minutes, was unable to crouch, balance, kneel, squat, or climb." Tr. 78. But, he further testified that no jobs could be performed by a person who: (1) "needed to change positions every 15 minutes and have a five minute break," Tr. 79; or (2) was limited to a total of two hours per day of sitting, standing, and walking.

After the hearing, the ALJ issued a decision in which she gave little weight to Dr. Rock's opinions, little weight to Dr. Hess's report, and some weight to "the administrative findings of fact made by the state agency non-examining medical and psychological consultants," Tr. 29. The ALJ's decision also includes the following relevant findings of fact and conclusions of law:

> 3. The claimant has the following severe impairment: degenerative lumbar disc disease with evidence of annular tear (20 CFR 404.1520(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525 and 404.1526).

. . . .

5.  After careful consideration of the entire record,
the undersigned finds that the claimant has the
residual functional capacity to perform sedentary work
as defined in 20 CFR 404.1567(a) except that after one
hour of sitting, he would need to stand without
leaving the work station and stretch for two to three
minutes.  He would need to avoid climbing ladders,
ropes, or scaffolds.  He could crouch on only a rare
basis (less than or equal to 10% of the workday).  He
could perform other postural activities on an
occasional basis.  He could reach on a frequent, but
not constant, basis.  He could lift objects from the
floor on only a rare basis (again, meaning less than
or equal to 10% of the workday).  He needs to avoid
working on slippery, wet, or elevated flooring, as
well as erratically moving surfaces.  He is limited to
performing uncomplicated tasks (typically learned in
30 days or less); and due to symptoms, his ability to
concentrate, persist and maintain pace would be
diminished, but his productivity would not be more
than 10% below the norm.

. . . .

10.  Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR
404.1569 and 404.1569(a)).

Tr. 17, 19, 20, 30.  The ALJ concluded by finding that Garneau

was not disabled because he was capable of performing the three

jobs identified by the VE.

## III. Discussion

### A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. § 423(a)(1)(A)-(D). The only question in this case is whether the ALJ correctly determined that Garneau was not under a disability from January 10, 2013, through July 27, 2015.

To decide whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process. See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B. Garneau's Claims

Garneau claims that the ALJ erred by: (1) determining that

he did not have a severe mental impairment; (2) failing to give

proper weight to the opinions of Dr. Rock and Nurse Dustin; (3)

crafting an RFC based upon her own lay interpretation of raw

medical data rather than the opinion of a medical source; (4)

concluding that he had the RFC to perform sustained work-related

activities in a work setting on a regular and continuing basis;

and (5) relying upon VE testimony given in response to a flawed hypothetical question. Garneau's first claim is without merit, but taken in combination, his criticisms of the ALJ's assessment of his RFC warrant a remand.

### 1. Step Two

Garneau claims that at Step 2 of the sequential evaluation process, the ALJ erred by failing to find that he had a severe mental impairment. More specifically, he frames his claim this way: "The ALJ erred in according Dr. Hess' report 'little weight' (Tr. 26), and minimizing the interrelated impact of pain and mental health symptoms on [his] ability to maintain the attention and concentration needed for any work." Cl.'s Mem. of Law (doc. no. 8-1) 19. The court does not agree.

It is well established that "the Step 2 severity requirement is . . . a de minimis policy, designed to do no more than screen out groundless claims," McDonald v. Sec'y of HHS, 795 F.2d 1118, 1124 (1st Cir. 1986) (citing Social Security Ruling ("SSR") 85-28, 1985 WL 56856 (S.S.A. 1985)), and that "a finding of 'non-severe' is only to be made where 'medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work,'" id. (quoting SSR 85-28, 1985 WL 56856, at *3). However, "[e]rrors at Step Two

15

are harmless as long as the ALJ found at least one severe impairment, continued on with the sequential analysis, and considered the effect of all impairments on the claimant's functional capacity." Therrien v. Berryhill, No. 16-cv-185-LM, 2017 WL 1423181, at *4 (D.N.H. Apr. 21, 2017) (citing Fortin v. Colvin, No. 3:16-cv-30019-KAR, 2017 WL 1217117, at *10 (D. Mass. Mar. 31, 2017)).

Here, after the ALJ deemed claimant's mental impairments to be non-severe, she found claimant's back condition to be a severe impairment, and continued on with the sequential evaluation process. It is beyond dispute that she considered the effects of claimant's non-severe mental impairment(s), given both the limitation to uncomplicated tasks she included in claimant's RFC and her stipulation that claimant had a diminished ability to concentrate, persist and maintain pace. No more was necessary; if the ALJ erred at Step 2 by failing to find that claimant had a severe mental impairment, any such error was rendered harmless by the manner in which she considered claimant's mental impairment(s) thereafter.

Beyond that, the ALJ's determination that claimant did not have a severe mental impairment is supported by substantial evidence in the form of the conclusion that Dr. Lester reached after conducting his PRT assessment. For his part, claimant

does not argue that Dr. Hess's report establishes a severe impairment under 20 C.F.R. § 404.1520a(c)(4), or fails to establish an impairment that is non-severe under § 404.1520a(d)(1). Moreover, while claimant hints at a Step 2 argument based upon the ALJ's purportedly erroneous evaluation of Dr. Hess's opinions, he does not actually make such an argument.

In sum, Garneau's claim that the ALJ erred at Step 2 provides no basis for a remand.

### 2. Claimant's Physical RFC

According to the VE, Garneau's ability to work would be completely precluded by any of one of four limitations presented to him as Garneau's, including three or more absences from work each month. While the ALJ did not specify in her RFC the number of days per month that Garneau was likely to be absent from work, she necessarily determined that he would not be absent more than two days a month, given the VE's testimony that the customary tolerance for absence was "[n]o more than two days a month." Tr. 74.

In his Spine Statement, Dr. Rock opined that Garneau would be absent from work more than four days per month due to his back condition or treatment for it. If the ALJ had credited

that opinion, then she would have determined that Garneau was disabled. But she gave that opinion "little weight."

Under the applicable regulations, the opinions of treating sources such as Dr. Rock are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(c)(2). When an ALJ does not give controlling weight to a treating source's opinion, she must still determine how much weight to give that opinion by considering the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). After an ALJ considers those factors, "[i]n many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Hunt v. Colvin, No. 16-cv-159-LM, 2016 WL 7048698, at *7 (D.N.H. Dec. 5, 2016) (quoting SSR 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996)).

Finally, an ALJ must give "good reasons in [her] decision for the weight [she] give[s] [a claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

> To meet the "good reasons" requirement, the ALJ's reasons must be both specific, see Kenerson v. Astrue, No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (citation omitted), and supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010). In sum, the ALJ's reasons must "offer a

rationale that could be accepted by a reasonable
mind." <u>Widlund v. Astrue</u>, No. 11-cv-371-JL, 2012 WL
1676990, at *9 (D.N.H. Apr. 16, 2012) (citing <u>Lema v.
Astrue</u>, C.A. No. 09–11858, 2011 WL 1155195, at *4 (D.
Mass. Mar. 21, 2011)), <u>report and recommendation
adopted by</u> 2012 WL 1676984 (D.N.H. May 14, 2012).

<u>Jenness v. Colvin</u>, No. 15-cv-005-LM, 2015 WL 9688392, at *6
(D.N.H. Aug. 27, 2015).  Here, the ALJ did not give good reasons
for discounting Dr. Rock's opinion and, as a result, her
decision is not supported by substantial evidence.

The ALJ's decision seems to suggest that the opinions in
Dr. Rock's May 2015 Spine Statement are "of no probative value,"
Tr. 28, at least in part because that document "reflects quite
clearly that [Dr. Rock] was (as the claimant testified)
irritated that he had to complete yet another report on his
patient's behalf," <u>id.</u>  It is not clear what bearing Dr. Rock's
ill temper might have on the substantive weight the ALJ was
obligated to give his opinion and, if anything, it might tend to
explain the terseness of some of Dr. Rock's responses.

With respect to the opinion Dr. Rock gave in his May 2015
Spine Statement concerning Garneau's likely absence from work,
the ALJ provided the following evaluation: "He states the
claimant will be absent more than four days per month, but notes
no change in the claimant's condition or diagnosis since the day
he first evaluated him."  Tr. 28.  That is not a good reason for
discounting Dr. Rock's opinion.

For one thing, the ALJ did not explain the logic behind her evaluation, and it is not apparent to the court. Whether or not Garneau's condition or diagnosis ever changed during the course of his treatment with Dr. Rock has no discernable bearing on the reliability of Dr. Rock's opinion. Moreover, even if the ALJ's premise was not problematic, it is also directly contradicted by the record. In April of 2013, Dr. Rock reported: "Straight leg raising isn't particularly positive." Tr. 280. In May of 2013, he reported: "Straight leg raising isn't particularly positive." Tr. 290. In November of 2014, he reported: "Straight leg raising is positive on the left." Tr. 420. So, over the course of his treatment relationship with Garneau, Dr. Rock <u>did</u> note a change in Garneau's condition in the form of increasingly positive straight-leg raising test results. Moreover, that change is not insignificant; a positive straight-leg raising test is one of the conditions that must be found to support a determination that a claimant has a listing-level disorder of the spine. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04.

In addition to her specific criticism of Dr. Rock's opinion that clamant would be absent from work more than four days a month, the ALJ gave a more general evaluation:

> The undersigned finds the opinions of Ms. Dustin and Dr. Rock conclusory and against the weight of the

record as a whole. The conclusions reached by these
treating sources are not supported by medically
acceptable signs, symptoms, and/or laboratory
findings, and are further based almost entirely on the
claimant's subjective complaints and out of proportion
to the objective evidence obtained during and for the
course of treatment. There are no treatment records
to substantiate such degrees of limitation. The
undersigned has evaluated this evidence and finds that
even though these reports are from treating sources,
these opinions are inconsistent and not supported by
the medical evidence as a whole. Therefore, these
reports . . . are accorded little weight.

Tr. 28. With respect to the specific opinion at issue, those
are not good reasons.

First of all, while the ALJ says that Dr. Rock's opinion is
"not supported by medically acceptable signs, symptoms, and/or
laboratory findings," Tr. 28, he expressed that opinion on a
form in which he also listed the following "positive objective
signs" of Garneau's back impairment:

Reduced range of motion ("stiff low back"), Positive
supine straight leg raising test (Left at 40°, Right
at 40°), Positive seated straight leg raising test,
Abnormal gait, Sensory loss, Tenderness, Swelling,
Muscle spasm, Muscle atrophy, and Weight change.

Tr. 537. To place those signs in context, the court notes that
degenerative disc disease qualifies as a listed impairment if it
results in compromise of a nerve root and is accompanied by:

Evidence of nerve root compression characterized
by neuro-anatomic distribution of pain, limitation of
motion of the spine, motor loss (atrophy with
associated muscle weakness or muscle weakness)
accompanied by sensory or reflex loss and, if there is

involvement of the lower back, positive straight-leg
raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04A.

Not only did Dr. Rock identify medical signs to support the
opinion he gave in his Spine Statement, the office note he wrote
in November of 2014 reports: (1) "stiffness with flexion and
extension and rotation of the lumbar spine," Tr. 420; (2)
"stiffness in his walking," id.; (3) "radiation of pain and some
numbness and tingling in the lower left leg," id.; and (4)
positive straight-leg raising, see id.  Given those findings,
viewed in light of the criteria for Listing 1.04, it is
difficult to credit the ALJ's determination that Dr. Rock's
opinion was not substantiated by objective evidence obtained
during the course of treatment and documented in Garneau's
treatment records.  In short, the purported lack of support for
Dr. Rock's opinion is not a good reason for discounting it
because there was record support.

Similarly unpersuasive is the ALJ's determination that Dr.
Rock's opinion was inconsistent with the record as a whole.
While the record in this case includes a host of opinions, there
is only one other opinion regarding the number of days that
Garneau was likely to be absent from work: Nurse Dustin's
opinion, expressed in her Spine Statement, that Garneau was
likely to be absent from work more than four days a month.  On

this point, Dr. Rock's opinion and Nurse Dustin's opinion are not just consistent; they are identical.[9]  Moreover, while both Dr. O'Neill and the occupational therapist at Androscoggin Valley Hospital who performed Garneau's functional capacity evaluation provided extensive opinions, neither of them addressed the question of absence from work.  So, inconsistency with the record as a whole is not a good reason for discounting Dr. Rock's opinion on absence from work.

And, indeed, given the lack of any on-point opinion to the contrary, it would appear that by determining that Garneau would be absent from work two days a month or fewer, the ALJ may have run afoul of the rule that generally precludes ALJs from interpreting raw medical data in functional terms and determining a claimant's RFC without support from an expert opinion.  See Durgin v. Berryhill, No. 16-cv-451-SM, 2017 WL 3432611, at * (D.N.H. July 24, 2017) (citing Nguyen v. Chater,

_____

[9] In addition, Nurse Dustin's Spine Statement includes a list of positive objective signs that is very similar to Dr. Rock's list:

> Reduced range of motion ("limited trunk [ILLEGIBLE] flexion of back neg extension"), Positive supine straight leg raising test (Left at 20°, Right at 40°), Positive seated straight leg raising test, Abnormal gait, Tenderness, Crepitus, Muscle spasm, Muscle weakness, and Impaired sleep.

Tr. 526.

172 F.3d 31, 35 (1st Cir. 1999); Santiago v. Sec'y of HHS, 944 F.2d 1, 7 (1st Cir. 1991)), R. & R. adopted by 2017 WL 3431956 (Aug. 9, 2017). Be that as it may, inconsistency with the record as a whole is not a good reason for discounting Dr. Rock's opinion on Garneau's likely absence from work.

To sum up, the ALJ testified that absence from work three or more days a month would preclude all work. The ALJ did not give good reasons for discounting Dr. Rock's opinion that Garneau was likely to miss four or more days of work a month. Accordingly, this matter must be remanded.

Finally, the court notes that Garneau's medical records appear to document most if not all of the findings necessary to support a determination that Garneau's degenerative disc disease qualifies as a listed impairment. On remand, the Acting Commissioner may wish to consider obtaining a consultative physical examination for the purpose of ascertaining whether claimant's degenerative disc disease qualifies as a listing-level disorder of the spine.

### IV. Conclusion

For the reasons given, the Acting Commissioner's motion for an order affirming her decision, document no. 10, is denied, and Garneau's motion to reverse that decision, document no. 8, is granted to the extent that the case is remanded to the Acting

Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of the court shall enter judgment in accordance with this order and close the case.

     **SO ORDERED.**

                                    Steven McAuliffe
                                    United States District Judge

October 10, 2017

cc:   Ruth D. Heintz, Esq.
       Robert J. Rabuck, AUSA